McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Plaintiff
WW 2083

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NETWORLD COMMUNICATIONS, CORP., | : | Civil Action No. |
| Plaintiff, | : | **COMPLAINT** |
| v. | : | **(JURY DEMAND)** |
| CROATIA AIRLINES, D.D., | : | |
| Defendant. | : | |

Plaintiff Networld Communications, Corp. of Parsippany, New Jersey, through its

counsel McCarter & English, LLP, brings this Complaint against Defendant Croatia Airlines,

D.D. for its bad faith and unsupportable attempt to terminate the parties' long standing business

arrangement in violation of a written contract and to cause injury to Plaintiff here in New Jersey.

Based upon the information known by Plaintiff to date, Defendant's conduct evidences a

deliberate intent to cause injury to Plaintiff and lacks any justification. Once necessary

discovery is conducted to further expose Defendant's scheme, Plaintiff expressly reserves the

right to join additional parties and assert a claim, by example, for tortious interference against

Defendant and all parties it has conspired with to terminate the existing written contract and

replace Plaintiff.

1

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiff Networld Communications, Corp. ("NCC") is a corporation organized
under the laws of the State of New Jersey with a principal place of business at 300 Lanidex
Plaza, Parsippany, New Jersey. NCC conducts business under the name Networld
Communications, Inc., is authorized to transact business in New Jersey, and is owned by a New
Jersey resident.

2.      Defendant Croatia Airlines, D.D. (referred to by its airline code "OU") is a
foreign corporation that, upon information and belief, was formed under the laws of the Republic
of Croatia. OU's head office is located at Bani, 75b, Buzin, 10010, Zagreb, Croatia.

3.      OU is subject to jurisdiction in the United States and specifically the State of New
Jersey as a result of its direct and systematic contacts with the State of New Jersey, dating back
to at least the year 1997. These contacts include numerous in-person visits to New Jersey by OU
officials to meet with NCC and discuss the parties' contractual arrangement. In addition, since
1997, OU officials have engaged in numerous and repeated telephonic and written
communications with NCC here in New Jersey.

4.      The amount in controversy exceeds $75,000 and jurisdiction is proper in this
Court pursuant to 28 U.S.C. Section 1332(a)(2). Venue is proper in view of the residency of the
Plaintiff, the non-exclusive venue provision contained in the parties' contract, and because the
documents and witnesses with knowledge of the underlying facts are located here in New Jersey.

## FACTUAL BACKGROUND

5.      NCC is a subsidiary of DGG Holdings, Ltd, a holding company headquartered in
New Jersey that operates in the global business to business travel and tourism industry sector.
With over thirty years of experience, DGG Holdings operates a business that is international in

2

MEI 16251679v.1

scope in the following areas: hotel industry, airline industry, meetings management industry, and hospitality consulting industry.

      6.      NCC provides, as a subsidiary of DGG Holdings, focused and customized service to its valued international airline customers, both domestically and internationally. The vast majority – over 90% - of all sales, marketing, and operational activity occurs domestically in the United States. NCC has a long established reputation for excellence in providing superior services to airline partners, through its marketing, sales, and operational efforts in New Jersey and throughout the United States.

      7.      NCC is a General Sales Agent or Official Representative for a number of international airlines, including Defendant OU. OU does not fly to the United States; instead, NCC facilitates United States and Canadian passengers' ability to utilize and "connect" from the United States and Canada into OU's European routes.

      8.      NCC's headquarters are in Parsippany, New Jersey, from where it provides its major operational, technical, sales, and services. In addition, NCC's entire airline call center (inbound and outbound calls) and sales management team and senior management team are located in the Parsippany office. More than a dozen NCC employees are dedicated full or part time to the OU work and have been dedicated for more than fifteen years. Many of these employees have been employed on the account since the parties' relationship began in 1997.

      9.      In order to properly discharge its obligations and responsibilities to OU, as described more fully below, NCC's sales department has cultivated relationships with dozens of agents in the Tri-State Area, as well as approximately 400-500 travel agency producers throughout the entire United States.

3

10.     OU is aware of these long standing commitments and efforts by NCC, which have been necessary to expand OU's business and revenues since 1997.

11.     By way of example, NCC has grown OU's revenues in the United States from approximately $2 million (in 1997) to $26 million presently (in 2012). This represents an annual growth rate of approximately 20% during the parties' relationship. During almost every year of their relationship, NCC has met or exceeded OU's growth expectations. NCC has been OU's best performing General Sales Agent since the inception of the contractual relationship over fifteen years ago.

12.     Upon information and belief, approximately 30% - 50% of the business generated by NCC for OU comes from the Tri-State Area. Given the importance of this market, and the major revenues generated by NCC for OU, OU's top executives and senior level sales and operations managers have visited NCC's offices in Parsippany on multiple occasions. In addition, to implement and expand the parties' business relationship, OU officials have repeatedly communicated with NCC here in New Jersey by means of telephonic and written communications since 1997.

13.     In August of 1997, the parties signed their first sales agency agreement. On May 2, 2002, NCC and OU then entered into another General Sales Agreement ("the May Agreement"), which defined the parties' respective obligations to one another. The May Agreement was subsequently amended on May 5, 2006, and again in July of 2011.

14.     The currently effective General Sales Agreement ("the Agreement") was signed by the parties on July 1, 2011, with an effective date of January 1, 2012. A true and correct copy of the Agreement is attached as Exhibit A and expressly incorporated by reference.

4

15.     Pursuant to Article 1 of the Agreement, NCC was appointed as OU's General Sales Agent in the United States and Canada. The term of the Agreement was for four years, expiring on December 31, 2015, subject to further renewals as specified in Article 3.1.

16.     From January 1, 2012 through the present, NCC fully and faithfully discharged all of its obligations to OU under the Agreement. At no time during this period did OU provide formally or informally any notice of noncompliance with the Agreement. Nor did OU raise any questions concerning NCC's performance under the Agreement because there was nothing to question.

17.     Instead, there was silence from OU until May 27, 2013, when it sent an email to NCC claiming that as a result of external factors wholly unrelated to NCC's performance under the Agreement or the terms of the Agreement itself, OU needed to "deeply revise" the compensation NCC was contractually entitled to receive. A copy of this communication is attached as Exhibit B and expressly incorporated by reference.

18.     Article 33 of the Agreement, entitled Modifications, expressly requires all "modifications of or additions" to the Agreement to be made in a "document duly signed by both parties." NCC never agreed to modify the Agreement and OU does not have the unilateral right to do so as the Agreement clearly states.

19.     NCC responded to OU's May email by advising that due to an ongoing audit by the Internal Revenue Service and its potential impact on OU depending upon OU's conduct, it was not a prudent time to discuss OU's request to unilaterally revise the Agreement, a right that OU did not have then or have now. A copy of NCC's June 10, 2013 communication is attached as Exhibit C and expressly incorporated by reference.

5

20.    OU did not respond to the June email and there was silence from it until July 30, 2013. On that date, OU sent NCC a letter purporting to terminate the Agreement. A copy of this communication is attached as Exhibit D and expressly incorporated by reference.

21.    By purportedly and generally invoking Article 3.2, OU stated it was terminating the Agreement effective September 1, 2013. OU's actions are in bad faith, are a sham, and have no basis in law or in fact.

22.    As noted previously, at no time during the course of the parties' Agreement did OU ever provide NCC with notice that it was in default of any obligation or requirement.

23.    Even the purported termination notice fails to specify what obligation or requirement NCC failed to satisfy. The termination notice is silent in this regard because there is nothing OU can rely upon to validly support its motives here.

24.    A close reading of Article 3.2's subparagraphs confirms there is no basis for the termination notice. OU is not able to demonstrate, let alone allege, that NCC has triggered any of the preconditions to early termination.

25.    NCC is not ceasing its business in whole or in part. NCC has not failed to pay any amount due to OU under the Agreement or failed to timely cure after receipt of written demand from OU. To the contrary, OU owes NCC money for services rendered to date that has not been paid. NCC has not called a meeting to pass a resolution calling for it to wind down its operations. NCC has not failed to pay its debts as they fall due. Nor has NCC committed any breach of the Agreement or failed to timely cure after receipt of written demand from OU.

26.    There is no basis for OU to terminate the Agreement and their notice to do so effective September 1, 2013, in view of the parties' long term relationship and the severe damage – financial and reputational - it will cause NCC, evidences their bad faith and malicious conduct.

6

27.     OU's failure to enumerate a specific provision, let alone supporting facts, within Article 3.2 in support of its termination notice, demonstrates that OU is engaged in a calculated and deliberate scheme to cause injury to NCC. OU's conduct is driven by ulterior motives having nothing to do with NCC's performance and full compliance with its obligations under the Agreement.

28.     The significance of OU's May 27 email seeking to have NCC voluntarily give up valuable monies it was entitled to earn under the Agreement, and NCC's response that it would not engage in such a conversation at the time, is better understood in light of the termination notice. Unable to get NCC to agree to amend the Agreement, OU is now trying to terminate it entirely.

29.     Whether OU's actions are based on its misreading of Article 3.2, or if it callously thought that NCC would allow the financial and reputational damage caused by OU's conduct to go unchallenged, OU has no basis to terminate the Agreement.

## COUNT I
### (Breach of Contract)

30.     NCC repeats and realleges the prior paragraphs of the Complaint and expressly incorporates them by reference.

31.     NCC and OU are parties to the Agreement, an enforceable and valid contract that remains in effect through December 31, 2015.

32.     Pursuant to the Agreement, NCC was required to carry out and discharge its contractually defined obligations, which it has done.

33.     At no time has OU provided any notice to NCC of any noncompliance with or violation of the Agreement.

7

MEI 16251679v.1

34.     The termination notice sent by OU to NCC has no basis in fact or law and is a pretext for an improper motive and equally improper purpose.

35.     As a result of its unjustified and malicious conduct, OU has breached the Agreement and as a direct and proximate result, NCC will be injured both economically and reputationally.

WHEREFORE, Plaintiff seeks the entry of Judgment against Defendant as follows:

(a)     compensatory, consequential, and punitive damages in an amount to be established by the Jury.

(b)     a full accounting under the Agreement of all revenues due to NCC, including but not limited to (i) sales credits for Canada, (ii) sales credits for the United States, (iii) proof of the actual documented sales collected by OU from the territory of the United States and Canada, and (iv) proof of payment to all required governmental authorities and bodies of taxes, charges, and fees in order to establish the exact amounts due to NCC.

(c)     such other relief as the Court deems just and equitable.

## COUNT II
### (Breach of Implied Covenant of Good Faith/Fair Dealing)

36.     NCC repeats and realleges the prior paragraphs of the Complaint and expressly incorporates them by reference.

37.     NCC and OU are parties to the Agreement, an enforceable and valid contract that remains in effect through December 31, 2015. The parties have a mutual obligation to act under the Agreement in accordance with the implied covenant of good faith and fair dealing.

38.     Pursuant to the Agreement, NCC was further required to carry out and discharge its contractually defined obligations, which it has done.

8

ME1 16251679v.1

39.     At no time has OU provided any notice to NCC of any noncompliance with or violation of the Agreement.

40.     The termination notice sent by OU to NCC has no basis in fact or law and is a pretext for an improper motive and equally improper purpose. As a result, OU has breached the implied covenant of good faith and fair dealing.

41.     As a result of its unjustified and malicious conduct, OU has breached the Agreement and breached the implied covenant of good faith and fair dealing, and as a direct and proximate result, NCC will be injured both economically and reputationally.

WHEREFORE, Plaintiff seeks the entry of Judgment against Defendant as follows:

(a)     compensatory, consequential, and punitive damages in an amount to be established by the Jury.

(b)     a full accounting under the Agreement of all revenues due to NCC, including but not limited to (i) sales credits for Canada, (ii) sales credits for the United States, (iii) proof of the actual documented sales collected by OU from the territory of the United States and Canada, and (iv) proof of payment to all required governmental authorities and bodies of taxes, charges, and fees in order to establish the exact amounts due to NCC.

(c)     such other relief as the Court deems just and equitable.

## COUNT III
### (Misappropriation of Confidential Information)

42.     NCC repeats and realleges the prior paragraphs of the Complaint and expressly incorporates them by reference.

43.     In order to discharge its enumerated responsibilities under the parties' Agreement, NCC shared with OU its confidential and proprietary marketing and business strategies.

9

ME1 16251679v.1

44. Article 31 of the Agreement requires the parties to take "all practical measures" to maintain the confidentiality of the other party's business information. Given OU's conduct to date, including its pretextual termination notice, NCC believes that OU may seek to wrongfully utilize NCC's confidential and proprietary marketing and business strategies with the replacement agency it hires.

45. NCC endeavors to keep its confidential and proprietary marketing and business strategies out of the public domain in order to maintain a competitive advantage.

46. NCC will be damaged if OU is allowed to utilize its confidential and proprietary marketing and business strategies.

WHEREFORE, Plaintiff seeks the entry of Judgment against Defendant as follows:

(a) preliminarily and permanently enjoining Defendant and all third parties from utilizing Plaintiff's confidential and proprietary marketing and business strategies.

(b) preliminarily and permanently enjoining Defendant and all third parties from continuing to possess Plaintiff's confidential and proprietary marketing and business strategies.

(c) compensatory, consequential, and punitive damages in an amount to be established by the Jury.

(d) such other relief as the Court deems just and equitable.

## COUNT IV
### (Termination of NCC's Obligations)

47. NCC repeats and realleges the prior paragraphs of the Complaint and expressly incorporates them by reference.

48. Pursuant to Article 11 of the Agreement, NCC provided Defendant with an irrevocable bank guarantee ("the Guarantee") to secure its obligations under the Agreement.

10

ME1 16251679v.1

49.     NCC has faithfully and fully discharged all of its obligations under the

Agreement.

50.     OU's purported notice of termination is a pretext for OU's ulterior motives here

and has nothing to do with NCC's performance under the Agreement.

51.     Under the circumstances, the Guarantee should be cancelled immediately and be

of no further force and effect.

WHEREFORE, Plaintiff seeks the entry of Judgment against Defendant as follows:

(a)     preliminarily and permanently enjoining Defendant and all third parties from

taking any action involving the Guarantee other than its cancellation and return to Plaintiff.

(b)     preliminarily and permanently enjoining Defendant and all third parties from

continuing to possess the Guarantee.

(c)     compensatory, consequential, and punitive damages in an amount to be

established by the Jury.

(d)     such other relief as the Court deems just and equitable.


                                    Respectfully submitted,

                                    McCARTER & ENGLISH, LLP
                                    Attorneys for Plaintiff


                            By: _____/s/_____
                                    WILLIAM D. WALLACH
                                    A Member of the Firm

Dated:  August 8, 2013

## DEMAND FOR JURY

Plaintiff respectfully demands trial by jury on all issues presented in this Complaint.

## EXPRESS RESERVATION OF RIGHTS

Once necessary discovery is conducted to further expose Defendant's scheme, Plaintiff expressly reserves the right to join additional parties and assert a claim, by example, for tortious interference against Defendant and all parties it has conspired with to terminate the existing written contract and replace Plaintiff.

## RULE 7.1 DISCLOSURE

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Plaintiff Networld Communications, Corp., states that it is not a publicly-held corporation, that it is a subsidiary of privately-held DGG Holdings, Ltd., and there is no publicly-held corporation that owns 10 percent or more of its stock.

McCARTER & ENGLISH, LLP

By: _____ /s/ _____
    WILLIAM D. WALLACH
    A Member of the Firm

Dated: August 8, 2013

12

ME1 16251679v.1

# Exhibit A

# GENERAL SALES AGENCY AGREEMENT

between

**CROATIA AIRLINES d.d.**, whose head-office is at Bani 75b, Buzin, 10010 Zagreb, Croatia, telephone (385-1) 616-0066, facsimile (385-1) 617-6845, hereinafter referred to as **"PRINCIPAL"**

and

**NETWORLD COMMUNICATIONS, INC.**, **dba CROATIA-AMERICA**, whose head-office is at 300 Lanidex Plaza, PARSIPPANY, N.J. 07054, telephone (+1-973) 884-3401, facsimile (+1-973) 428-3929 hereinafter referred to as **"GSA"**



**WHEREAS**, the Principal and the GSA are parties to this General Sales Agreement dated May 2, 2002 (the "Existing Agreement");

**WHEREAS**, the Principal and the GSA are also parties to an Addendum To The General Sales Agency Agreement executed on May 2, 2002, dated May 5, 2006, ("the Addendum") and **attached hereto** this Existing Agreement;

**WHEREAS**, the Principal and the GSA wish to amend the General Sales Agreement dated May 2, 2002 and the Addendum To The General Sales Agency Agreement dated May 5, 2006, subject to the terms set forth in this document, and then replace it with the new and amended terms and conditions set forth in this document (the Existing Agreement, as extended and amended below, and the Addendum To The General Sales Agency Agreement, as extended and amended below, shall hereinafter referred be referred to as "this Agreement");

**NOW, THEREFORE**, it is hereby agreed as follows:

**A.** Section A, Article 3, Validity/Termination, of the Addendum executed on May 5, 2006 is modified and extended as follows, as of August 1, 2011, and the following is inserted in lieu thereof:

## Article 3

### Validity / Termination

3.1 The Existing Agreement is extended from August 1, 2011 to December 31, 2011. All other terms of the Existing Agreement and the Addendum shall remain the same, and in full force and effect, as set forth in the Existing Agreement and the Addendum, during the period between August 1, 2011 and December 31, 2011, except as follows:

- The Incentive Commission percentage that will be earned by the GSA for the period between August 1, 2011 to December 31, 2011 shall be calculated in the following manner: The Incentive Commission percentage that will be actually achieved by the GSA pursuant to the Addendum for the period covering 01 August 2010 – 31 July 2011, shall also be applied to the actual total fare sales achieved by the GSA between 01 August 2011 – 31 December 2011. This Incentive Commission, for the period between 01 August 2011 – 31 December 2011, will be paid to the GSA by the Principal by 25th February 2012.

**B.** At midnight on December 31, 2011, the Addendum To The General Sales Agency Agreement executed on May 2, 2002, dated May 5, 2006, and **attached hereto** this Existing Agreement, shall expire.

**C.** Effective immediately on January 1, 2012, the Existing Agreement shall be renewed and extended, and the following specified Sections of the specified Articles of the Existing Agreement shall be deleted in their entirety and the following shall be inserted in lieu thereof, as reflected below in this Agreement:



Article 1

Appointment of General Sales Agent

The principal hereby appoints CROATIA-AMERICA as its sole General Sales Agent (GSA) in the USA and Canada (hereinafter referred to as the "Territory") to the extent of and in accordance with the terms and conditions contained in this Agreement. The Principal shall have the right at all times to engage in the Territory in the sale of transportation for and over its own and its own code share flights, subject to the terms of Article 16.

It is hereby understood between the parties that the appointment of GSA under this agreement is limited to the commercial matters only, and shall not be deemed or interpreted to give any power to the GSA that is not expressly specified in this Agreement.

Article 2

Separation of Functions

The GSA should not be accredited as an IATA Approved Location in any country included in the Territory. In the event that the GSA applies for accreditation as an IATA Agent in the Territory, it shall immediately notify the Principal. In the further event that it is subsequently accredited, the Principal may terminate the appointment of the GSA under this Agreement forthwith.

Article 3

Validity /Termination

3.1 This Agreement is valid for a period of four (4) years commencing on 01 January 2012 and terminating on 31 December 2015 (the Initial Term).

After the Initial Term, this Agreement shall hereafter automatically extend for further successive periods of 4 years, unless terminated by either party giving to the other at least six (6) months prior written notice of cancellation before the end of Initial Term or before the end of each subsequent four-year term, as the case may be, that shall be without prejudice to any outstanding liabilities accrued and arising hereunder between the parties hereto.

Earlier Termination

3.2    Either Party my by giving written notice to the other Party, terminate this Agreement with effect from the date stated in such notice or, if none, with immediate effect, if:



3.2.1    the other Party ceases or threatens to cease to carry on its business or substantially the whole of its business, or stops or suspends making payments with respect to all or any class of its debts or announces an intention to do so, if any such action is not cured, pursuant to section 3.2.2 below, within thirty (30) days from written notice or demand; or

3.2.2    the other Party fails to pay any amount due under this Agreement and such default is not cured within thirty (30) days from written demand, unless the GSA has taken the necessary legal actions to pursue recovery of funds when/if the delay is not caused by the GSA.; or

3.2.3    the other Party calls a meeting for the purpose of passing a resolutions to wind it down or such a resolution is passed, or a resolution is passed by the directors of the other Party to seek a winding up or administration order, or the other Party presents, or has presented, a petition for a winding up order, or presents, or has presented, a petition to appoint an administrator, or has an administrative receiver, or receiver appointed overall or any part of its business, undertaking, property or assets (otherwise than for the purposes of a solvent amalgamation or reconstruction where the resulting entity is at least as creditworthy as the other Party and assumes all of the obligations of the other Party under this Agreement); or

3.2.4    the other Party fails to pay its debts as they fall due, except as described and called for in clause 3.2.2 above; or

3.2.5    the other Party suffers of undergoes any procedure analogous to any of those specified in Clauses 3.2.1 or 3.2.3 inclusive or any other procedure available in the country in which the other Party is constituted, established or domiciled against or to an insolvent debtor or available to the creditors of such a debtor; or

3.2.6    the other Party commits a breach, other than the ones described and called for in sections 3.2 – 3.2.5 above, of its obligations under this Agreement which is not remedied within thirty (30) days of the receipt by the other Party of a written notice from the Party not in breach requiring the remedy.

Article 4

Duties of GSA

The duties of the GSA as Passenger General Sales Agent of the Principal shall comprise:

a)    Providing and operating inquiry, reservations and booking offices readily identifiable as the offices of the Principal's, and equipped and staffed for the sale of passenger transportation over counter, by mail or by telephone.
b)    Supplying the Principal with the relevant information about the Territory and opportunities in it.
c)    The sale of transportation on the scheduled air services of the Principal.
d)    Solicitation and promotion of sales on the scheduled air services of the Principal.



e)   Undertaking of special publicity and promotional campaigns when so requested by the Principal, in accordance with Article 7 of this Agreement.

f)   Prominent display, as far as is practical, of the Principal's advertising publicity and display materials in the windows and interiors of the GSA's offices in the Territory.

g)   Bringing promptly to the notice of the GSA's booking and reservations staff and to Sales Agents in the Territory instructions, special advice and sales information sent to GSA by Principal.

h)   Issuance of passenger tickets or miscellaneous charge orders in connection with all sales made on behalf of the Principal, provided that at least one Principal's segment is included.

i)   Advice to passengers concerning passport, health, currency, immigration and other regulations in force in countries to and through which they are to travel and ensuring as far as practicable that such regulations are observed by all such passengers.

j)   Distribution of timetable and other publicity matter provided by the Principal.

k)   Issuance of Principal's travel documents only in GSA offices in the Territory; distribution of ticket stock to travel agents is not allowed.

l)   Responsibility for the collection and remittance of fare and all applicable taxes, fees and charges for all Principal's documents issued by the GSA.

m)   Communication with ARC/BSP agents in the Territory regarding sales of Principal's services.

n)   Correspondence with ARC/BSP office based upon written request from the Principal.

o)   Any communication with ARC/BSP office to be promptly communicated to the Principal.

p)   Submission of a succinct monthly written "activity report", within 15 days after the completion of each month, summarizing only relevant sales contacts, sales conversations and/or meetings, as well as only relevant product-related and market-related news and/or trends. The report will be based on the seasonal conditions in the market at the time and may include recommendations by the GSA, as necessary, to improve sales.

It is understood between the parties that the sale of transportation (seats) on charter air services of the Principal does not make part of GSA's duties under this Agreement and the GSA is not authorized to engage in the sale of charter air services, unless otherwise advised by Principal in writing for each particular case or unless the Principal initiates its own scheduled and official Charter service from the Territory at any time during the validity period of this agreement.

Article 5

Principal's Right of Direct Approach to Other Sales Intermediaries

Without prejudice to the provisions of Article 4 hereof, the Principal reserves the right of direct sales and direct distribution of publicity matter and similar materials to sales agents in the Territory. In such instances, in order to respect and protect the GSA's professional position in the Territory, the GSA will be fully informed in each case in writing, in advance.



Article 6

Conditions of Sale

In performance of this Agreement the GSA is obliged to act with the principles of fair cooperation. Furthermore, the GSA is obliged to protect assets and interests of the Principal, to observe all applicable laws, IATA resolutions and recommendations, the Conditions of Carriage for passengers and baggage (APT, ABC, TIM) and the Principal's Conditions of Carriage for passengers and baggage.

The GSA is not authorized to modify or supplement the terms and conditions set forth in the Conditions of Carriage or other publications.

The GSA shall observe accurately all instructions and information given by the Principal.

Article 7

Cost of Special Publicity

The cost of special publicity undertaken at the Principal's request in accordance with Article 4 (d) hereof shall be subject to the prior written consent and/or approval of the Principal. Cost of special publicity or sales promotions that are solely at the GSA's expense do not require the prior written consent and/or approval of the Principal.

Article 8

Traffic Documents

All stock of passenger tickets and miscellaneous charges ("MCOs") orders reasonably required by the GSA in connection with the sales of transportation herein shall be supplied free of charge by the principal, provided always that:

1.  Such documents shall remain the property of the Principal.
2.  The GSA shall at all reasonable times permit any authorized official representative of the Principal to inspect and check the stock of such documents held by the GSA.
3.  The GSA shall be responsible for the return to the Principal, within thirty (30) days following the termination of this Agreement, of all the principal traffic documents held by the GSA and for accounting for any documents which may be found subsequently, to be unreturned or unreported.
4.  The GSA will apply for the traffic documents in written form at the following address:

    CROATIA AIRLINES, 75b Buzin, 10010 Zagreb, CROATIA

    Traffic documents will be sent through express mail. The Principal shall enclose the reverse of the quantity and the type of traffic documents thus sent and the GSA shall by his signature verify the receipt of all documents stated in the reverse.



Page 6 of 22

5.  The GSA is obliged to sell traffic documents in the sequence of their serial numbers and to observe all pertinent IATA resolutions and instructions regarding filling up the traffic documents, its invalidation and other manipulation with it.

The GSA shall apply security standards for the safe custody of Traffic Documents and of Identification Plates of the Principal in standards which are no less than the standards set forth in Attachment "B" of IATA Resolution 800. The GSA shall be responsible for any expense, loss of revenue or damage caused to the Principal by theft or misuse of traffic documents for all tickets on the GSA's premises. For documents issued to appointed sales agents, the GSA shall exercise and enforce safe care and proper use of all documents at all times in order to minimize the loss or damage sustained by the Principal arising from any theft, misappropriation, loss or improper use of such documents. The GSA shall also be responsible for obtaining, on appropriately stamped or headed stationery, written evidence from the appointed sales agents of the Principal's traffic documents supplied by the GSA.

Article 9

9.1 Standard Sales Commission

The Standard Sales Commission for the GSA shall be 0% for any fare applied, unless specifically agreed otherwise.  The GSA shall be allowed to mark up fares.

9.1.2 GSA Commission

9.1.2(a) GSA Base Commission: On all sales within the Territory utilizing the ticket stock of the Principal and ARC/BSP ticket stock validated on OU-831, the Principal shall pay to the GSA the GSA Base Commission, provided that the applicable fares have been collected and paid over to the Principal.  The GSA Base Commission is 3%.

Annual periods to be taken into consideration start from 1st January of each year until 31st December in the same year.  The above GSA Base Commission will be due and payable to the GSA based on the method specified in Section 10.2 of this Addendum.

9.1.2(b) GSA Incentive Commission: GSA Incentive Commission for Sales within the Territory during each annual period on the Principal's Traffic Documents and on ARC/BSP ticket stock validated on OU-831



| $ | - | $10,000,000 | | 0% incentive commission |
|---|---|---|---|---|
| $10,000,001 | to | $15,000,000 | 1.50% | incentive commission |
| $15,000,000 | to | $19,000,000 | 2.50% | incentive commission |
| $19,000,001 | to | $22,000,000 | 2.75% | incentive commission |
| $22,000,001 | to | $25,000,000 | 3.00% | incentive commission |
| $25,000,001 | to | $29,000,000 | 3.25% | incentive commission |
| $29,000,001 | to | $34,000,000 | 3.75% | incentive commission |
| $34,000,001 | to | $40,000,000 | 4.25% | incentive commission |
| $40,000,001 | and over | | 4.50% | incentive commission |

Annual periods to be taken into consideration start from 1st January of each year until 31st December of the same year. The above incentive commission will be due and payable to the GSA based on the method specified in Section 10.2 of this Addendum.

The GSA will, each year during this Agreement, offer performance-based incentive agreements to the top 5 OU agents. The incentive offers shall provide the top 5 OU agents, upon the agents' agreement and signature of such agreements, an opportunity to earn up to 35%, in the aggregate, of the earned GSA Incentive Commission from the prior year. The performance-based incentive agreement offers shall be paid solely by the GSA and based on and payable on the agents' increase in year-on-year sales performance, with a network minimum sales requirement in the incentive agreements which shall be made known to the Principal. The incentive agreements shall be based on the same fiscal period as this Agreement (i.e., the calendar year period), and the GSA shall endeavor to conclude each incentive agreement with each of the top 5 OU agents by one week after the receipt of March sales results.

### 9.1.3 No Commission

No commission whatsoever shall be paid on excess baggage charges, Industry Discount and Service documents.

### 9.1.4 Prepaid

The GSA agrees to issue tickets on a PTA basis.

For all tickets issued on PTA basis the Principal will grant the GSA USD 25 per each issued ticket.

### 9.2 Commission Calculation

### 9.2.1

The basis for the GSA commission calculations are applicable fares and charges related to fare increases based on IATA rules. This shall include, but not be limited to, published tariff fares, market fares, net fares and fare sales derived from Internet



access from within the Territory. The basis for the GSA commission calculation excludes all other charges, taxes or fees which are collected in relation to the sale of traffic document.

GSA commission is calculated by subtracting the percentage agreed from the applied fare of the sold document. In case that the fare is commissionable, basis for the GSA commission is a net fare (applied fare - applied commission = basis for the GSA commission).

## 9.2.2

The incentive commission referred to in Section 9.1.2(a) shall be calculated based on sold data.

## 9.2.3

This section is left intentionally blank.

## 9.2.4

The GSA's right to commission is conditional upon timely payment of all duly collected amounts due to the Principal under this Agreement.

In case that the Principal following the General Conditions of Carriage of Passengers and Baggage and IATA regulations approves partial or full refund of the fare, the GSA has to refund (via credit note or other agreed means) to the Principal all commissions paid in connection with any refunded fare.

### 9.3 Remuneration of Sales Agents

The Standard Sales Commission for appointed sales agents shall be 0% for any fare applied, unless specifically agreed otherwise. The appointed sales agents shall be allowed to mark up fares as the market will bear.

### Article 10

#### 10.1 Accounting and Settlement to the Principal

The GSA has to make a monthly sales report for sales made by the GSA and non-ARC/BSP sales agents in the Territory. The sales report has to be made once a month for the sales from the first till the last day of the month and sent to the Principal within 10 days of the end of the report period in which those transactions are made:

The sales report shall be in the format as may be determined by the Principal from time to time and subject to the terms and conditions advised by the Principal and agreed by the GSA.



Sales report is formed of:

- recapitulation (2 copies)
- ticket return (2 copies)
- audit coupons of all used (sold, cancelled and exchanged) traffic documents
- check or a copy of bank remittance

Sales report has to be sent through express mail at GSA's cost to the following address:

CROATIA AIRLINES, Revenue Accounting (SODP), Bani 75b, Buzin, 10010 Zagreb, CROATIA

All payments due shall be sent to the Principal not later than the 10th of the following month for the reporting of the previous month.

All payments required to be made by the GSA shall be made net, free and clear of and without any deduction, set-off or counter claim, except for non-ARC/BSP sales agent commissions, if any, and the Principal's credit notes, containing a *reference* to specific sales report/s for which payment is made (specification of sales reports for which the remittance is made), and remitted to:

**Beneficiary:**

Croatia Airlines d.d.

**Bank Details:**

| | |
|---|---|
| Bank Account Number: | 7101502-181563-3 |
| Bank Name: | Privredna Banka Zagreb |
| Bank Branch & Address: | Rackoga 6, 10000 Zagreb, Croatia |
| Swift Code: | PBZGHR2X |
| Bank Code: | HR70 2340 0091 5102 0370 6 |

If there has been no sale in any given reporting period, the GSA shall so inform the Principal in writing.

After review of the GSA report (containing sales by the GSA only), the GSA will be informed of any irregularity, and accordingly will receive a credit or debit note within 30 days of the reporting of such sales. The GSA is obliged to pay the outstanding amount within fifteen (15) days. The GSA shall in no way be responsible for debit notes created by sales of non-ARC/BSP agents, as well as debit notes created by sales of ARC/BSP agents.

The GSA has the right to deduct its GSA Base Commission and Incentive Commissions only upon the receipt of the credit note issued by the Principal, or as otherwise set forth in this Addendum, provided that no irregularity has been found after the control of sales reports and no outstanding amounts for the respective period the commission is calculated for (in which case the GSA may deduct only the credited amount, less any irregularity and/or notified correction).



Page 10 of 22

10.2 Accounting and Settlement to the GSA

The GSA shall receive the GSA Base Commission on a monthly basis based on reported monthly sales as reported by ARC data. This amount shall be paid via bank wire transfer to the GSA.

The GSA shall receive the GSA Incentive Commission on a monthly basis in the fixed amount of 70.000 $. This amount shall be paid via bank wire transfer to the GSA. At the end of the entire accounting period (i.e., 31 December), the Principal will settle any final balance due and pay all outstanding debts not later than the 25th of February. The Incentive Commission amounts shall be paid via bank wire transfer to the GSA.

Article 11

Security against Financial Loss and/or the GSA's default

The GSA shall within ten (10) days from the date this Agreement is signed, provide the Principal with an irrevocable bank guarantee in the amount of not less US$ 50,000 ("The Guarantee"). Any amount under The Guarantee shall be payable upon demand without the need to give grounds for the demand. The Guarantee has to be issued and payable by an international bank or by a US bank acceptable to the Principal.

The Guarantee shall be held by the Principal as security for the full and punctual performance of all of the GSA's financial obligations under this Agreement.

In respect of Guarantee, the Principal shall be entitled to draw down upon demand at any time in whole or in part for the payment of any amounts past due from time to time from the GSA under this Agreement, or may utilize the Guarantee in whole or in part to perform any of the GSA's financial obligations under this Agreement, or otherwise remedy any financial default on the part of the GSA, without prejudice to any other remedy of the Principal. Further to Section 3.2.2 of this agreement, this clause shall apply only after proper notice has been given to the GSA and the subsequent remedy period has expired.

In any such event, and if the GSA Agreement has not be terminated, the GSA shall on demand of the Principal issue the new bank guarantee in the same amount and form set forth in this Article.

The GSA shall procure that, within ten (10) days of payment to the Principal, the Guarantee is replaced by a new guarantee so that the amount available for drawing under the guarantee is always US$ 50,000 during the whole period of this Agreement.



In any such event, the GSA shall on demand of the Principal issue the new bank guarantee in the same amount and form set forth in this Article.

The validity period of the Guarantee shall be until the termination date specified in paragraph 3.1 above (or any extension thereof) plus 90 days.

Should any event of financial default on the part of GSA occur, the Guarantee shall automatically be applied to any financial sum due to the Principal, unless the Principal thereafter elects otherwise by notice to the GSA.

Within ninety (90) days after the termination of this Agreement, the Principal shall, provided written confirmation of no event of default on the part of the GSA has occurred and is continuing, and then will return The Guarantee to the GSA.

Article 12

### Agency Expenses

The GSA shall provide, for the purpose of the Agency hereby created, at the GSA cost and responsibility, suitable premises, qualified staff, equipment, facilities and supervision and in consideration of the remuneration and reimbursements payable under the provisions hereto shall defray all costs and expenses of and incidentals to the agency except as may be provided specifically in this Agreement.

Article 13

### Equipment

In pursuance of Article 4 of this agreement, the GSA shall provide at its own expense all common user equipment and stationery as may be necessary at the premises referred to in Article 4 and 14 of the Agreement.

Article 14

### Reservation System Costs

Reservation system cost related to the reservation services over the services of the Principal under this Agreement shall be payable by the Principal. These costs include the license fee for the use of the software and Amadeus monthly fee. The Principal shall endeavor to provide the GSA a second Amadeus terminal as soon as reasonably possible.

Article 15

### Instruction and Standard

The GSA shall at all times comply with reasonable directions and instructions given by the Principal concerning the services to be provided under the terms hereof and shall ensure that all its staff concerned shall be at all times familiar with all such directions and instructions as may be amended from time to time.



Page 12 of 22

௰

In providing the services required herein, the GSA shall observe and comply with all applicable laws and regulations and generally shall carry out its duties thereunder with all due efficiency and dispatch and to standards required by the Principal. In reverse, the same will apply to the Principal wherever and whenever reasonably relevant.

## Article 16

### Principal's Right to Maintain Own Office/Staff Liaison

The Principal reserves the right to establish its own office and to station its own management and staff in the Territory in any capacity at its own expense, and the GSA undertakes to afford full facilities to and maintain all necessary liaison with such staff in carrying out their duties. It is the Principal's responsibility to insure that the duties of such management and staff do not prevent, restrict or inhibit the GSA in the performance of its duties described in this agreement.

## Article 17

### Information, Reports and Inspection of Records

The GSA shall endeavour to make the Principal aware of all relevant information concerning local laws, regulations and restrictions affecting the transportation of passengers including those relating to taxes, customs, immigration, currency and health and shall promptly advise any alteration thereto.

The GSA shall compile and render promptly to the Principal such statistics, returns and reports as may reasonably be required by the Principal in respect of the GSA's activities under this Agreement.

The GSA shall at all reasonable times, and with reasonable advance notice, permit the authorized official of the Principal to inspect and check GSA records/documents and accounting transactions maintained on behalf of the Principal's business. The Principal may make copies of such records or documents.

The GSA shall at all reasonable times, and with reasonable advance notice, permit the authorized official of the Principal access to the premises of the GSA to inspect document and property of the Principal held by the GSA.

All records accounts and documents held by the GSA on behalf of the Principal must be preserved by the GSA for a period of one year or according to local law whichever is greater.



Page 13 of 22

## Article 18

### Designation of Agency

The GSA shall be entitled to describe itself as agent of the Principal, at its places of business and on commercial documents, advertisements, notices, publications, letterhead and similar items, but shall in all cases qualify such descriptions by prefixing the words General Sales Agent.

## Article 19

### Directory Insertion and Publicity

The GSA shall, if so requested by the Principal, arrange for the insertion in appropriate telephone and other directories of the name of the Principal and the local address of the GSA and showing its own name as GSA if it so wishes. Any change for such entries shall be, when inserted at the Principal's request, rechargeable to the Principal.

## Article 20

### No Action Contrary to Law

Nothing contained herein shall require the GSA to take any action contrary to law or contrary to any rule, resolution, or agreement of the International Air Transportation Association.

## Article 21

### Prohibited Dealings

In matters arising out of this agreement, the GSA shall not give credit to or deal with any person, firm or company to whom the Principal shall from time to time instruct it not to give credit or to deal with.

## Article 22

### Exemption from Failure to Perform

Both parties shall be exempted from liability in respect of any failure to perform its obligations under this Agreement, arising from and of the following causes:

a) Labour disputes involving a complete or partial stoppage of work and strikes threatened or actual (whether of the employees of the affected party or of others on whom it may be depending to fulfill this Agreement).



b) Force majeure of any other cause beyond the control of the affected party, provided that in the event of such stoppage or failure, the affected party shall use its best endeavours to fulfill its obligations herein.

No exemption as aforesaid shall apply to the GSA's payment obligations hereunder.

### Article 23

#### Liability/Indemnity

The GSA agrees to indemnify and hold harmless the Principal, its officers and employees from all damage, expense or loss resulting from the negligence and/or the misconduct of the GSA including as a result any misuse of traffic documents of the Principal.

Except as otherwise expressly provided in this Agreement and the schedules hereto, the Principal hereby indemnifies the GSA from and against all actions, claims, losses, proceedings, costs, damages, charges and expenses which the GSA may sustain, incur or pay by reason of any service rendered by the GSA under the terms of this Agreement for which the Principal is legally liable, unless caused by the negligence, misconduct or breach of duty on the part of the GSA or any of its employees or agents.

### Article 24

#### Governing Law – Choice of Jurisdiction

This Agreement shall be governed by and construed in accordance with the laws of the Republic of Croatia.

The parties to this Agreement agree to use the best reasonable efforts to resolve by negotiation any dispute that may arise with respect to this Agreement.

All disputes arising out of this Agreement that cannot be resolved by negotiation shall be submitted to the court of competent jurisdiction in Zagreb, Republic of Croatia, which jurisdiction shall be non-exclusive.

### Article 25

#### Warranty

The GSA shall not give any warranty in the name of the Principal except where the same shall have been authorized by the Principal.



Article 26

Legal Proceedings

The GSA shall not take legal proceedings in the name of the Principal without the prior written consent of the Principal nor shall it without such consent defend, settle, release, or discontinue any action or other legal proceedings or otherwise prejudicially affect the interest of the Principal.

Furthermore, it is hereby expressly agreed by the parties and understood by the GSA, that the GSA is not authorized to represent the Principal before the courts in the USA and Canada, nor to receive any court summons whatsoever on behalf of the Principal.

In case of any passenger claim, the GSA shall notify the Principal promptly in writing at the address and by means referred to in the Article 34.

The GSA is not entitled to settle any passenger claim, unless approved by the Principal in writing.

The GSA will be liable to the Principal for all damage resulting from violation of his appointment as General Sales Agent.

Article 27

Transfer of Agency/Subcontraction of Appointment

The GSA shall not assign, transfer or delegate its rights or responsibilities under this Agreement without the prior consent in writing of the Principal, provided however, that it may subcontract the doing or preferring of the acts, duties or obligations which by this Agreement is required or obliged to do or perform but shall, nevertheless, be responsible to the Principal for all such acts, duties and obligations being properly and duly done or performed.

Article 28

Acceptance of other Appointment

The GSA shall not accept other appointment as General Passenger Sales Agents by any other carrier that is competitive with the Principal without the prior written consent of the Principal, which consent shall not be withheld unreasonably. Consequently, for the duration of this Agreement, the Principal will not appoint any other Passenger GSA in the Territory.



Page 16 of 22

### Article 29

### Default and Termination for Cause

If the GSA at any time defaults in observing or performing any of the provisions of this Agreement, including causes stipulated in the Article 3.2 and in case of material and malicious/purposeful incorrect (fraudulent) application of fares or charges on a repeated/sustained basis by the GSA, this Agreement may, at the sole opinion of the Principal, and notwithstanding any other provision, be terminated forthwith by serving an immediate notice of termination. Exactly the same will apply in reverse.

### Article 30

### Return of Property

On the termination of this Agreement, whosoever occasioned, the GSA shall forthwith surrender to the Principal all property, material and matter of a permanent nature entrusted to it by the Principal and shall account for any deficiency therein.

### Article 31

### Confidentiality

The party hereto shall take all practical measures to ensure that information concerning each other's business results and activities are not revealed to any third party without the consent of the party concerned.

### Article 32

### Notices

Any notice or other communication required or permitted to be given herein shall be sufficient if sent by mail, courier letter, telegram or telex by one party to the other, as follows:

(i)    if to the Principal:

       CROATIA AIRLINES
       75b Buzin
       10010 Zagreb
       Croatia

       Tel:   385 1 616-0066
       Fax:   385 1 617-6845



Page 17 of 22

    (ii)    if to the GSA:

            Networld Communications
            dba CROATIA – AMERICA
            300 Lanidex Plaza
            PARSIPPANY, NJ 07054
            USA

            Tel:   973-884-3401
            Fax:  973-428-3929

Article 33

Modifications

Modifications of or additions to this agreement must be approved in writing by the responsible official of both parties and shall, therefore, be attached to this Agreement as amendments. This Agreement may only be amended or modified by document duly signed by both parties.

Article 34

Additional Provisions


      1.  In the event of an inconsistency between any provision of the Existing Agreement, the Addendum, and this Agreement, the provision of this Agreement shall be controlling.

      2.  This Agreement, and any attachments to it, may be executed in any number of counterparts, each of which shall be deemed one original document, and all of which together shall be deemed one and the same instrument.

This Agreement is made in English language, in four (4) equal copies, two (2) for each party.

For the GSA                      For the PRINCIPAL

_____         _____

Davor Gjivoje, Jr.                  Tonko Rilovic
Chief Executive & Vice Chairman    Executive Vice President, Sales
                             Marketing, Network and Revenue
                             Management
Signed: May _____, 2011        Signed: May _____, 2011
    July 1, 2011

Page 18 of 22 18

# Exhibit B

## Davor Gjivoje Jr

| | |
|---|---|
| **From:** | Galovac Andrea [andrea.galovac@croatiaairlines.hr] |
| **Sent:** | Monday, May 27, 2013 8:54 AM |
| **To:** | Davor Gjivoje Jr |
| **Cc:** | Saban Lidija; Jelavić Nenad; Kučko Krešimir |
| **Subject:** | GSA Agreement |
| **Attachments:** | GSA ANNEX 23 05 13.docx |

| | |
|---|---|
| **Categories:** | Urgent Response!, External |

Dear Mr. Gjivoje,

I hope this e-mail finds you well.

As you are probably aware, at the end of last year Croatia Airlines has entered into restructuring process with a firm goal of returning to profitability.
Under the strict rules of European Union, which have already been implemented in Croatian legal system, restructuring plan has been drafted and
sent to Competition agency for its final approval. Under its scrutiny process, the Competition agency, along with the OU owner (Government),
is revising our current commercial agreements, audit reports and feasibility of the proposed restructuring plan. This means that Croatia Airlines,
as a company with financial problems, will be eligible for state aid only after the Competition agency finds that we have achieved the required level of self-contribution in our overall restructuring costs.

Therefore we are contacting you as well, among our other business partners, with appropriate proposals of amendments to our existing contract.
Although we are forced to deeply revise and reevaluate our cooperation, we sincerely hope you will recognize this as an effort to ensure our long-term viability which could allow us to cooperate successfully in years to come.

Please find attached our proposed amendments.

Your sincerely,

**Andrea Galovac**
Direktor prodaje
Sales Director

Croatia Airlines
Zrinjevac 17, Zagreb
T +385 1 6160 276
F + 385 1 6160 270
andrea.galovac@croatiaairlines.hr
www.croatiaairlines.hr

Nova usluga Croatia Airlinesa – web check-in!
Prijavite se za svoj let preko naše web stranice www.croatiaairlines.com

1

New Croatia Airlines service – web check-in!
Check in for your flight on our website www.croatiaairlines.com

---

Outbound message verified by McAfee E-mail and Web Security Appliance

**CROATIA AIRLINES d.d.,** whose head-office is at Ba i 75b, Buzin, 10010 Zagreb, Croatia, telephone (385-1) 616-0066, facsimile (385-1) p17-6845, hereinafter referred to as **"PRINCIPAL"**

and

**NETWORLD COMMUNICATIONS, INC., dba CROATIA-AMERICA,** whose headoffice is at 300 Lanidex Plaza, PARSIPPANY, N.J. 07054, telephone (+1-973) 884-3401, facsimile (+1-973) 428-3929 hereinafter referred to as **"GSA"**

on May 25th 2013 have concluded

## ANNEX 1 TO THE GENERAL SALES AGREEMENT

### Article 1

It is hereby confirmed that on July 1st 2012 two Parties have signed the General Sales Agency Agreement (hereinafter: the Agreement)

### Article 2

The Parties hereby agree to delete entirely article 9.1.2.(b) and amend article 10.2. to read as follows:

**10.2 Accounting and Settlement to the GSA**
The GSA shall receive the GSA Base Commission on a monthly basis based on reported monthly sales as reported by ARC data. This amount shall be paid via bank wire transfer to the GSA.

### Article 3

All other clauses of the Agreement remain valid.

### Article 4

This Annex is made in four (4) equal copies , two (2) for each party.

This Annex shall become effective as of June 1st 2013.

For the GSA                                    For the PRINCIPAL

# Exhibit C

## Davor Gjivoje Jr

| | |
|---|---|
| **From:** | Davor Gjivoje Jr |
| **Sent:** | Monday, June 10, 2013 12:28 PM |
| **To:** | 'Galovac Andrea' |
| **Cc:** | Kučko Krešimir; Jelavić Nenad; 'Dado (Davor, Jr.) (dado@networldinc.com)' |
| **Subject:** | FYI - Confidential |

**Importance:** High

### Confidential

Dear Mrs. Galovac:

Further to recent correspondence, I also wanted to inform you **(CONFIDENTIALLY)** that we are currently under a United States Government Internal Revenue Service (IRS) Audit. This is not an unusual process, and it is not a cause for concern *per se.* We have been audited by other United States agencies before, and have always completed them successfully – and without penalty assessed to our Company.

This audit by the Federal Government/Internal Revenue Service, we believe, strongly impacts the timing of any decision about the Annex. Our advisors do *not* believe that now is the best time to be revising or amending any partner contracts or agreements, especially not during the United States Government audit process. This would only increase the IRS's interest and oversight of any such agreement and relationship, because our answers about our partner relations might actually change the focus and scope of the audit itself.

In fact, the United States IRS has actually taken an interest in recent weeks in our contract with Croatia Airlines (especially in the collection and remittance of ticket sales) and in other partners, and our advisors believe that "stability" and "normalcy" at the moment are the best course of action. Why am I saying this? Quite simply, because we don't know the exact status of Croatia Airline's compliance with and timeliness of payments of taxes and fees to various US authorities (including OU's compliance with the payment of excise taxes due to the United States IRS *itself*).

Our assumption and hope, and strong belief, is that all is in good order, and that OU is in full compliance (we have, of course, previously reported, remitted and described in detail to OU all such obligations by OU to relevant US agencies, and informed OU of all its tax obligations to all US authorities). But, any change, however benign, in an ongoing relationship that is a topic of an IRS audit could shift the auditor's attention/focus and scope. If anything is not in 100% perfect order at the moment, then making OU, or any of our partners, a subject of "heightened inquiry" by the US Government due to a contract discussion in the middle of a US Government audit is not advisable at this time. We believe we can successfully handle all questions to-date, but we'd rather not have to change our answers as the audit progresses (especially not because of any changes to the Agreement, such as any new Annex) and risk more scrutiny and increase/widen the scope by the IRS. We anticipate that the IRS audit could last another 4 – 6 months.

I feel it is appropriate to inform you and any appropriate OU personnel, at a minimum, of what is happening here in North America, and we feel that a "low key" environment which emphasizes the "ordinary course" is the best strategy *vis a vis* the IRS in these circumstances for all our airline partners. This minimizes the chances of the IRS digging, and digging – which would only lead to a more complex, in-depth, time-consuming process, with a potential broadening/widening of exposure relating to any relationship that is the topic of the current audit. (This "non-disturbance" policy we have towards our partners for this audit is in the best interest of our partners quite simply because it minimizes the exposure risk to our partners.)

I trust you will keep the above strictly confidential, and that you will share the above information with appropriate OU employees *and only on a "need to know" basis*. I want to emphasize that we are confident that we can complete the audit successfully, especially if we have the steady, routine, "ordinary course" support of our partners.

1

My best,

Davor, Jr.

cc:    Mr. Kucko - Confidentially
       Mr. Jelavic - Confidentially

# Exhibit D



CROATIA AIRLINES

NAŠ ZNAK / OUR REF          456/13 NJ

Networld Communications, Inc. d/b/a Croatia-America
300 Lanidex Plaza
Parsippany, New Jersey  07054

Attention:    Davor Gjivoje, Jr.          VAŠ ZNAK / YOUR REF
              Chief Executive & Vice Chairman

**VIA MAIL, COURIER AND FACSIMILE**          . DATUM / DATE          Zagreb, 30.07.2013


Re:    Croatia Airlines/Networld Communications
       General Sales Agreement dated July 1, 2011


Dear Sir,

We refer to the General Sales Agreement currently in effect between Croatia Airlines and Networld Communications, Inc. and wish to advise that, pursuant to Article 3.2 of that Agreement, Croatia Airlines is terminating the General Sales Agreement effective September 01, 2013.  In accordance with Articles 8.3 and 30 of the Agreement, please return to Croatia Airlines within thirty (30) days following the termination of the Agreement all property of Croatia Airlines.  In accordance with Article 10.2 of the Agreement, any sums due and owing to Networld Communications for ticket sales made during the year 2013 will be paid, together with any other outstanding debts, no later than November 01, 2013.

Please confirm receipt of this termination letter.

We thank you for your past work with Croatia Airlines.

Sincerely yours,

CROATIA AIRLINES d.d.
Zagreb          44

Nenad Jelavić

EVP Sales, Marketing, Network and Revenue Management