NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **NETWORLD COMMUNICATIONS, CORP.,** | |
| Plaintiff, | Civil Action No. 13-4770 (SDW) |
| v. | **OPINION** |
| **CROATIA AIRLINES, D.D., et al.,** | |
| Defendants. | June 1, 2015 |

**WIGENTON,** District Judge.

**I.    INTRODUCTION**

This matter comes before the Court on Plaintiff Networld Communications, Corp.'s ("NCC") motion for partial summary judgment (Dkt. No. 54) and Defendants Croatia Airlines, D.D. ("OU") and Lidija Saban's ("Saban") cross motion for partial summary judgment (Dkt. No. 62) pursuant to Federal Rule of Civil Procedure 56.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Venue is proper pursuant to 28 U.S.C. § 1391.  These motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For reasons discussed herein, this Court **DENIES** both Plaintiff's motion for partial summary judgment and Defendants' cross motion for partial summary judgment.

## II. BACKGROUND[1]

NCC is a privately-owned New Jersey corporation with its principal place of business in Parsippany, New Jersey. *See EFC No. 46, Second Amended Complaint ("Second Am. Compl.")*, ¶ 9. OU is a publicly traded Croatian corporation headquartered in Zagreb, Croatia, with the majority of its stock owned by the Croatian government. *Id.* ¶ 10. Defendant Saban is an OU employee who, for the past decade, was primarily responsible for OU's relationship with NCC. *Id.* ¶ 11.

Since at least 1997, NCC has served as OU's General Sales Agent ("GSA") in the United States and Canada. *Id.* ¶ 2. As GSA, NCC had a variety of responsibilities relating to the marketing and sale of OU flights to North American customers, including establishing relationships with travel agents, implementing sales initiatives, and providing customer call center services. *Id.* During the time period in which NCC served as GSA, OU saw its North American sales grow from $2 million in 1997 to $26 million in 2012. *Id.*

NCC and OU's relationship was governed by a General Sales Agency Agreement ("Agency Agreement" or "the Agreement"). *Id.* ¶ 3. The parties' fourth multi-year contract was executed on July 1, 2011, became effective January 1, 2012, and was to last for four years. *Plaintiff's Statement of Undisputed Facts ("Pl.'s SOF") ¶¶ 4-6.* For months before the Agreement was executed, OU was in a financially unstable position: it was operating at a loss and had significant loan liabilities. *Defendants' Statement of Undisputed Facts ("Defs.' SOF") ¶ 5; see EFC No. 62, Declaration of Marko Baretic ("Baretic Decl."), ¶ 24.* In fact, on March 29, 2011, approximately three months before the Agreement was negotiated and executed, in order to avoid bankruptcy, OU's Supervisory Board adopted a Financial Recovery Plan and a Business Plan

---

[1] The following facts are undisputed, unless otherwise indicated.

outlining OU's proposed restructuring plan. *Defs' SOF, ¶¶ 25-26*. Accordingly, NCC was notified during the 2011 negotiations that OU was undergoing a financial restructuring process. *Id.* However, OU did not request special protections, such as a more permissible termination clause, in light of its poor financial condition. *Id.* In addition, the parties were aware that OU would become subject to the European Union's ("EU") stringent financial regulations when Croatia joined the EU in 2013. *Id. ¶¶ 4-5*.

As majority shareholder, the Croatian government routinely provided direct and indirect monetary assistance to OU, as a stopgap measure, through loan and lease guarantees. *ECF No. 54, Declaration of Davor Gjivoje Jr. ("Gjivoje Decl.") ¶ 24*. However, in early 2013, the European Commission advised the Croatian government that the manner in which it recapitalized OU, pursuant to a restructuring plan devised in November of 2012, violated the EU's rules regulating state aid. *Defs.' SOF, ¶¶ 17-18*. Consequently, OU overhauled its restructuring plans to comply with the EU's guidelines as well as local Croatian state aid rules. *Id. ¶20*. The new plan, which was formally adopted on June 27, 2013, required OU to cut "operational costs in an amount commensurate with the value of the state aid" it received. *Id. ¶¶ 20-24*.

By email dated May 27, 2013, OU advised NCC of its desire to "deeply revise" NCC's compensation structure as contemplated in the Agency Agreement, explaining that in an effort to restore OU's profitability, the company was obligated to "achieve[] the required level of self-contribution in [its] overall restructuring costs." *See EFC No. 62, Declaration of Andrea Galovac Ivanovic ("Ivanovic Decl."), Ex. A*. OU further indicated that it was offering NCC, as well as its other business partners, "appropriate proposals of amendment to our existing contract." *Id*.

The email contained an attachment titled "ANNEX 1 TO THE GENERAL SALES AGREEMENT", proposing changes to Articles 9.1.2(b) and 10.2 of the Agency Agreement, to

3

become effective four days later, on June 1, 2013. *Ivanovic Decl., Ex. B.* Specifically, the amended agreement would entirely delete Article 9.1.2(b), which governed the payment of performance-based incentive commissions for sales, and delete the portion of Article 10.2 that provided for payment of a fixed monthly incentive commission to NCC. *Id.*

On May 30, 2013, Davor Gjivoje, Chief Executive Officer and Vice Chairman of NCC confirmed receipt of the email, and on June 9, 2013, advised that NCC was preparing an answer to the proposed revisions. *Ivanovic Decl., Ex. C; Gjivoje Decl., ¶ 1.* On June 10, 2013, Gjivoje sent an email to OU's representative explaining that it would be imprudent to amend the Agency Agreement because NCC was undergoing a routine audit by the Internal Revenue Service ("IRS") at the time and revision of NCC's partner contracts would likely invite heightened scrutiny by the IRS and "change the focus and the scope of the audit . . ." *Ivanovic Decl., Ex. D.* Also, as NCC's CEO later elaborated, NCC was opposed to OU's plan to reduce NCC's commission structure. *See Gjivoje Decl., ¶ 20.* OU did not reply to NCC's response email. *Id.*

On or about July 30, 2013, OU notified NCC via letter that it was terminating the Agency Agreement effective September 1, 2013 "pursuant to Article 3.2 of [the Agency] Agreement." *Second Am. Compl., ¶ 4; Gjivoje Decl., Ex. B.* Article 3.2 governs early termination of the Agency Agreement. *Pl.'s SOF, ¶ 7.* Article 3 provides, in pertinent part:

> Article 3
>
> Validity /Termination
>
> 3.1 This Agreement is valid for a period of four (4) years commencing on 01 January 2012 and terminating on 31 December 2015 (the Initial Term).
>
> After the Initial Term, this Agreement shall hereafter automatically extend for further successive periods of 4 years, unless terminated by either party giving to the other at least six (6) months prior written notice of cancellation before the end of Initial Term or before the

end of each subsequent four-year term, as the case may be, that shall be without prejudice to any outstanding liabilities accrued and arising hereunder between the parties hereto.

Earlier Termination

3.2 Either Party my [*sic*] by giving written notice to the other Party, terminate this Agreement with effect from the date stated in such notice or, if none, with immediate effect, if:

> 3.2.1 the other Party ceases or threatens to cease to carry on its business or substantially the whole of its business, or stops or suspends making payments with respect to all or any class of its debts or announces an intention to do so, if any such action is not cured, pursuant to section 3.2.2 below, within thirty (30) days from written notice or demand; or

> 3.2.2 the other Party fails to pay any amount due under this Agreement and such default is not cured within thirty (30) days from written demand, unless the GSA has taken the necessary legal actions to pursue recovery of funds when/if the delay is not caused by the GSA.; or

> 3.2.3 the other Party calls a meeting for the purpose of passing a resolutions [sic] to wind it down or such a resolution is passed, or a resolution is passed by the directors of the other Party to seek a winding up or administration order, or the other Party presents, or has presented, a petition for a winding up order, or presents, or has presented, a petition to appoint an administrator, or has an administrative receiver, or receiver appointed overall or any part of its business, undertaking, property or assets (otherwise than for the purposes of a solvent amalgamation or reconstruction where the resulting entity is at least as creditworthy as the other Party and assumes all of the obligations of the other Party under this Agreement); or

> 3.2.4 the other Party fails to pay its debts as they fall due, except as described and called for in clause 3.2.2 above; or

> 3.2.5 the other Party suffers of [sic] undergoes any procedure analogous to any of those specified in Clauses 3.2.1 or 3.2.3 inclusive or any other procedure available in the country in which the other Party is constituted, established or domiciled against or to an insolvent debtor or available to the creditors of such a debtor; or

> 3.2.6 the other Party commits a breach, other than the ones described and called for in sections 3.2 - 3.2.5 above, of its obligations under this Agreement which is not remedied within thirty (30) days of the receipt by the other Party of a written notice from the Party not in breach requiring the remedy.

*See id. ¶ 7; see also*, Gjivoje Decl., Ex. A.

NCC brought suit against OU on September 8, 2013, alleging that OU breached the Agency Agreement by terminating the contract without good cause and, further, that Defendants engaged in a fraudulent conspiracy to deprive NCC of commissions and other revenue to which NCC is entitled. *See ECF No. 1, Complaint.* NCC asserted the following eleven causes of action: (1) breach of contract for improper termination; (2) breach of the implied covenant of good faith and fair dealing for improper termination of the Agency Agreement; (3) breach of contract for failure to pay amounts due; (4) breach of the implied covenant of good faith and fair dealing for failure to pay amounts due; (5) fraud; (6) breach of contract for cancellation and return of guarantee; (7) declaratory judgment; (8) accounting; (9) unjust enrichment; (10) tortious interference with contract; (11) violation of the New Jersey Sales Representative Rights Act ("SSRA"). *See Second Am. Compl., ¶¶ 52-112.*

NCC now moves for summary judgment as to Count 1 of the Complaint. *ECF No. 54.* Specifically, NCC seeks summary judgment as to its allegation of breach of contract for improper termination because "OU's notice of termination . . . did not reference any of the six reasons for early termination listed in Section 3.2 of the 2011 Agreement." *Pl.'s SOF, ¶ 10.* Defendants oppose NCC's motion for partial summary judgment, cross-move for partial summary judgment, and request an Order finding that OU "properly terminated the parties' agreement pursuant to Croatian law." *ECF No. 62; Defendants' Brief, p. 2.*

Article 24 of the Agency Agreement provides that the Agency Agreement "shall be governed by and construed in accordance with the laws of the Republic of Croatia." *Gjivoje Decl., Ex. A*. Accordingly, OU invokes Article 829 of the Republic of Croatia's Civil Obligations Act ("COA"), which provides that a party may terminate an agency contract for "important reasons." <u>See</u> *Defs.' SOF ¶ 45*. In its entirety, Article 829 states as follows:

> Termination of Contract
>
> Article 829
>
> (1) Each party may terminate a permanent contract without prior notice, or terminate a fixed-term contract prior to expiration of the period for which it was concluded, for important reasons, which must be stated, specially [sic] the failure of the other party to fulfill the contractual obligations or due to changes of circumstances.
>
> (2) The parties may not waive or limit this right contractually.
>
> (3) If the notice for termination of a permanent contract does not state an important reason, it shall be considered as termination with a regular period of notice.
>
> (4) A contracting party has a right to compensation of damage if the other party did not have an important reason for termination of the contract.
>
> (5) Unfounded termination entitles the other party to terminate a permanent contract without a period of notice, and/or to terminate a fixed-term contract prior to expiration of the period for which it was concluded.

<u>See</u> <u>id.</u> *at ¶ 46; Baretic Decl. Ex. B*.

In Defendants' view, NCC's refusal to amend the Agency Agreement to cooperate with OU in complying with the strictures imposed by its new financial restructuring process caused OU financial harm, and significantly so, because NCC's commission structure was far more generous than that of OU's other business partners. *Defs.' Br. p. 15*. Under such circumstances therefore,

7

Defendants argue, OU had an "important reason", i.e. the new financial restructuring process, to terminate the Agency Agreement under Article 829, regardless of the terms of the Agreement. *Id. at p. 27.*

### III.     STANDARD OF REVIEW

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See Fed R. Civ. P. 56(c)*; *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing *Fed R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See Fed. R. Civ. P. 56(e)*; *Anderson*, 477 U.S. at 249 (citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *Hip Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey*, 693 F.3d 345, 351 (3d Cir. 2012). Accordingly, it is not the Court's role to make findings of fact, but to analyze the

facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks*, 204 F.3d at 105 n.5 (citing *Anderson*, 477 U.S. at 249); *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.  ANALYSIS

To prevail on a breach of contract claim, a party must establish "(1) [a] contract between [the] Parties; (2) [a] breach of that contract; (3) damages flowing therefrom; and (4) that the party stating [the] claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Plaintiff alleges that OU's unexplained termination of the Agreement before its expiration date is actionable breach of the Agreement because the plain and unambiguous language of the Agency Agreement requires cause for early termination. In NCC's view, this Court need only address whether a particular clause of the contract—Article 3.2—was breached. Conversely, Defendants urge this Court to enforce the choice of law clause in the Agency Agreement, which provides that Croatian law controls the interpretation of the Agreement, and determine the termination issue under Article 829 of the COA. In order to interpret the Agreement, this Court must first resolve the choice of law question.

### Choice of Law

The parties disagree as to which law applies to the interpretation of the Agency Agreement. Pointing to the choice of law provision in Article 24 of the Agreement, Defendants seek application of Croatian law; specifically, Article 829 of the COA. Plaintiff does not squarely address whether Croatian law should apply or not; rather, Plaintiff contends that application of the COA does not obviate its entitlement to summary judgment.

9

It is an "elementary canon" of contract interpretation "that a contract must be read as a whole, and that individual provisions must be read in their context and not in a vacuum." *Internat'l Ass'n of Machinists and Aerospace Workers v. U.S. Airways, Inc.,* 358 F.3d 255, 266 (3d Cir. 2004) (citing *In re New Valley Corp.,* 89 F.3d 143, 149 (3d Cir. 1996)). It is an "equally fundamental canon that a contract must be read so as to give effect to all of its parts." Id. (citing *New Wrinkle, Inc. v. John L. Armitage & Co.*, 238 F.2d 753 (3d Cir. 1956)).

In a diversity case, a federal court applies the choice of law rules of the jurisdiction in which it sits. See *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 2011 U.S. App. LEXIS 18623, 2011 WL 3930285, *3 (3d Cir. 2011). New Jersey courts tend to enforce private choice of law clauses provided that they do not offend New Jersey public policy and the contract bears some relation to the chosen jurisdiction. See *GMC v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 331 (3d. Cir. 2001) (citing *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341, 614 A.2d 124 (1992)); *Nuzzi v. Aupaircare, Inc.*, 341 Fed. Appx. 850, 851 (3d Cir. 2009) (the choice of law provision is enforceable when the language is unambiguous and does not violate public policy); *Security Sav. Bank v. Green Tree Acceptance, Inc*., 703 F. Supp. 350, 354 (D.N.J. 1989); ("New Jersey conflict of laws principles clearly recognize the validity and enforceability of choice of law provisions in contracts . . . ."); see also *Gay v. Credit Inform*, 511 F.3d 369, 389 (3d Cir. 2007) ("courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."). In short, a choice-of-law clause will be enforced, unless 1) it is contrary to the public policy of the forum state; 2) the source of law has no reasonable relationship to the parties or the transaction; or 3) its language is ambiguous.

Applying these factors, this Court is satisfied that the parties' choice of law provision is enforceable. First, Article 24 of the Agreement unambiguously provides that the Agency

Agreement "shall be governed by and construed in accordance with the laws of the Republic of Croatia." *Gjivoje Decl., Ex. A*.  Secondly, based upon the facts presently before this Court, application of Croatian law presents no discernable conflict with New Jersey's public policy. Thirdly, Croatia has a reasonable relationship to the parties and the transaction: 1) the Agency Agreement concerns the provision of air travel by OU to and from Croatia; 2) OU is a publicly traded Croatian corporation headquartered in Zagreb, Croatia; and 3) the Croatian government owns a majority of OU's shares. *See Second Am. Compl. ¶ 9-11*.

Because there is ample federal authority honoring choice of law provisions in contracts, coupled with New Jersey's generous stance on enforcing choice of law provisions, this Court finds that Croatian law governs the interpretation of the Agency Agreement.

### Article 829 of the Civil Obligations Act

Defendants do not dispute that the Agency Agreement was terminated before its effective end date, and they do not, and perhaps cannot, dispute that the July 2013 termination letter failed to specify grounds for the early termination of the Agreement.  Rather, Defendants contend that the Agency Agreement was terminable at will under Article 829 of the COA, which permits unilateral early termination of an agency contract for "important reasons"—here, OU's 2013 financial restructuring plan—regardless of whether the terms of the contract provide that right. *Defs.' SOF ¶ 46*.

However, as Plaintiff correctly points out, Defendants' contentions of intensive fiscal problems rely on evidence entirely within Defendants' control.  Defendants also acknowledge that discovery has yet to be conducted in this case.  "[B]y its very nature, the summary judgment process presupposes the existence of an adequate record." *See Doe v. Abington Friends Sch*., 480

F.3d 252, 257 (3d Cir. 2007). Because discovery is not yet complete, Plaintiff's motion for partial summary judgment and Defendants' cross-motion for partial summary judgment are not ripe for adjudication and will be denied.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. No. 54) and Defendants' cross-motion for partial summary judgment (Dkt. No. 62.) are **DENIED**. An Order consistent with this Opinion follows.

s/ Susan D. Wigenton, U.S.D.J.

cc:    Hon. Steven C. Mannion, U.S.M.J.